**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE: THE HONORABLE LEO M. GORDON, SENIOR JUDGE**

| |
|---|
| IKADAN SYSTEM USA, INC. and WEIHAI GAOSAI METAL PRODUCT CO., LTD., |
| Plaintiffs, |
| v. |
| UNITED STATES, |
| Defendant, |
| and |
| HOG SLAT, INC., |
| Defendant-Intervenor. |

Court No. 21-00592

**PUBLIC VERSION**
Business Proprietary Information
deleted from within Brackets [ ]

**MEMORANDUM OF POINTS AND AUTHORITIES OF PLAINTIFFS**
**IN SUPPORT OF RULE 56.2 MOTION**
**FOR JUDGMENT ON THE AGENCY RECORD**

Douglas J. Heffner
Wm. Randolph Rucker
Richard P. Ferrin
FAEGRE DRINKER BIDDLE & REATH LLP
1500 K Street, N.W.
Washington, DC 20005
(202) 230-5803

*Counsel for Plaintiffs*

Dated: April 22, 2022

PUBLIC VERSION

## **TABLE OF CONTENTS**

RULE 56.2 STATEMENT ................................................................................. 1

Administrative Determination Sought To Be Reviewed ................................ 1

Issues of Law Together With the Reasons for Contesting the Administrative Determination....... 1

ARGUMENT ................................................................................................... 2

I.   CBP'S INTERPRETATION OF THE SCOPE OF THE AD/CVD ORDERS IS NOT IN ACCORDANCE WITH LAW, OR IS ARBITRARY AND CAPRICIOUS, BECAUSE CBP'S INTERPRETATION INCLUDES NOT ONLY STEEL GRATINGS, BUT ALSO INCLUDES ALL DOWNSTREAM PRODUCTS THAT USE STEEL GRATINGS AS AN INPUT. ............ 2

A.   Relevant Factual Background ................................................................. 3

B.   Standard of Review. ............................................................................... 5

1.   The Standard of Review in the Case of Interpretation of the Scope of AD/CVD Orders................................................................................................. 5

2.   The Court Owes No Special Deference to CBP's Interpretation of the AD/CVD Orders Because the Scope of the AD/CVD Orders Was Developed by Commerce, Not CBP. ............................................................................................. 7

C.   CBP's Interpretation of the Scope Is Contrary to the Plain Language of the AD/CVD Orders and Therefore Is Not in Accordance With Law. ............................................. 9

1.   CBP's Finding of Evasion Is Premised Entirely on the Unsupported Assertion That Plaintiffs' Imports of Pig Farrowing Crates and Farrowing Flooring Systems Are Within the Scope of the Orders Because This Merchandise May Include Steel Grating as an Input. ... 10

2.   CBP Is Wrong in Claiming that Because the Upstream Steel Grating Is Within the Scope, the Downstream Pig Farrowing Crates and Farrowing Flooring Systems Are Perforce Within the Scope. ......................................................................... 12

D.   Even If the Scope Language Were Ambiguous, CBP's Interpretation of the Scope Is Arbitrary and Capricious Because CBP Failed to Consider the Record Evidence That Commerce Is Required To Take Into Account in Interpreting Ambiguous Scope Language.. 17

1.   CBP Failed to Address Plaintiffs' Points That the Descriptions of the Merchandise Contained in the Original Petitions, Commerce's Investigation, and the Commission's Injury Investigation Show That Plaintiffs' Pig Farrowing Crates and Farrowing Flooring Systems Fall Outside the Scope of the Orders.................................................. 17

2.   CBP Failed to Address Plaintiffs' Arguments That Commerce's Five-Factor Test Leads to the Conclusion That Plaintiffs' Pig Farrowing Crates and Farrowing Flooring Systems Fall Outside the Scope of the Orders.................................................. 20

II.   CBP'S FINDING OF "EVASION" BY IKADAN AND GAOSAI IS BASED ON AN UNLAWFUL INTERPRETATION OF WHAT CONSTITUTES "EVASION" UNDER EAPA. ............................................................................................................ 21

A.   Standard of Review ............................................................................... 21

i

B.     The Plain Language of EAPA Requires Some Level of Culpability for an Affirmative Determination of "Evasion." ...................................................................................................... 22

    1.     The Plain Meaning of the Terms "False" Material Statement and Material "Omission" Requires Some Degree of Culpability Before CBP May Determine That an Importer Engaged in Evasion. ....................................................................................... 22

    2.     The Statutory Scheme Does Not Permit CBP to Use EAPA as an Alternative Forum to Commerce to Resolve Scope Issues. ............................................................... 23

C.     A Reasonable Disagreement Over the Scope of the Orders Cannot Be Considered a "Material and False Statement or Act or a Material Omission" Within the Meaning of EAPA. ........................................................................................................................................ 24

III.   CBP ARBITRARILY AND CAPRICIOUSLY SUSPENDED LIQUIDATION AND ASSIGNED AD/CVD CASH DEPOSITS IN AN OVERBROAD MANNER TO PLAINTIFFS' IMPORTS THAT CONTAIN NO TRIBAR, LACKING SUBSTANTIAL EVIDENCE THAT SUCH IMPORTS ARE "COVERED MERCHANDISE." ..................................................... 27

A.     Relevant Factual Background ............................................................................. 28

B.     Standard of Review ............................................................................................. 31

C.     Most of Plaintiffs' Imports Contain No Tribar. ................................................. 33

    1.     Pig Farrowing Crates Without Farrowing Floor Systems Are Indisputably Outside the Scope of the Orders, Because They Contain No Tribar or Steel Grating. ........................... 33

    2.     CBP's Determination Is Unsupported by Substantial Evidence Because It Ignored Undisputed Evidence Showing That Only Two Ikadan Entries Contain Tribar Flooring. ... 34

    3.     CBP's Determination Is Unsupported by Substantial Evidence Because It Ignored Undisputed Evidence Showing That Many of Gaosai's Entries Contained No Tribar Flooring. .................................................................................................................................. 35

D.     CBP Assessed Duties Based on a Conclusory, *Sub Silentio*, and Unsupportable Determination That All Farrowing Crates Necessarily Contain Tribar Flooring. ................... 37

E.     In Its Administrative Review, CBP Avoided Determining Which Entries/Line Items of Merchandise Imported by Ikadan and Gaosai Actually Contained Tribar Flooring Input. ...... 39

F.     CBP's Failure to Correct Its Overbroad Determination Results in a Determination That Is Arbitrary, Capricious, and Unsupported by Substantial Evidence. ......................................... 40

IV.    CONCLUSION AND PRAYER FOR RELIEF. .............................................................. 41

PUBLIC VERSION

## TABLE OF AUTHORITIES

**Cases**

*Apex Frozen Foods Private Ltd. v. United States*, 862 F.3d 1322 (Fed. Cir. 2017) .................... 6

*Chevron, USA, Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984) ........ 6, 21

*Consol. Edison Co. v. NLRB*, 305 U.S. 197 (1938) .................................................... 32

*Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607 (1966) ................................................. 32

*Diamond Sawblades Mfrs. Coalition v. United States*, 43 CIT ___, 405 F. Supp. 3d 1345 (2019) ........................................................................................... 21

*Diamond Tools Tech. LLC v. United States*, 45 CIT ___, 545 F. Supp. 3d 1324 (2021) ............................................................................................*passim*

*Duferco Steel, Inc. v. United States*, 296 F.3d 1087 (Fed. Cir. 2002) ................................ 15, 16

*DuPont Teijin Films USA v. United States*, 407 F.3d 1211 (Fed. Cir. 2005) ........................... 32

*Icdas Celik Enerji Tersane ve Ulasim Sanayi, A.S. v. United States*, 44 CIT ___, 426 F. Supp. 3d 1353 (2020) ....................................................................................... 6

*Merck & Co., Inc. v. Kessler*, 80 F.3d 1543 (Fed. Cir. 1996) .................................................. 8, 9

*Meridian Prod. v. United States*, 890 F.3d 1272 (Fed. Cir. 2018) ............................................ 19

*Motor Vehicle Mfrs. Ass'n of United States Inc. v. State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29 (1983) ......................................................................... 31, 32

*Nippon Steel Corp. v. United States*, 458 F.3d 1345 (Fed. Cir. 2006) ...................................... 32

*OMG, Inc. v. United States*, 972 F.3d 1358 (Fed. Cir. 2020) ................................................ 7, 17

*Royal Brush Mfg., Inc. v. United States*, 45 CIT ___, 545 F. Supp. 3d 1357 (2021) ................. 31

*Saha Thai Steel Pipe Public Co., Ltd. v. United States*, 45 CIT ___, 547 F. Supp. 3d 1278 (2021) ................................................................................................ 19

*Sandvik Steel Co. v. United States*, 164 F.3d 596 (Fed. Cir. 1998) ............................................ 8

*Stein Industries, Inc. v. United States*, 43 CIT ___, 365 F. Supp. 3d 1364 (2019) .............. 13, 14

*Sunpreme Inc. v. United States*, 946 F.3d 1300 (Fed. Cir. 2020) (*en banc*) ........................... 7, 8

ACTIVE.135866278.03

PUBLIC VERSION

*Trendium Pool Products, Inc. v. United States*, 43 CIT ___, 399 F. Supp. 3d 1335 (2019) ...... 16

*United States v. Ford Motor Co.*, 463 F.3d 1267 (Fed. Cir. 2006) ............................................. 26

*United States v. Optrex America, Inc.*, 32 CIT 620, 560 F. Supp. 2d 1326 (2008) ................... 25

*United Steel & Fasteners, Inc. v. United States*, 947 F.3d 794 (Fed. Cir. 2020) ..................... 7, 8

*Vietnam Firewood Co. Ltd. v. United States*, 44 CIT ___, 466 F. Supp. 3d 1273 (2020) ...... 5, 33

*Whirlpool Corp. v. United States*, 890 F.3d 1302 (Fed. Cir. 2018) ..................................... 6, 7, 8

## Statutes

19 U.S.C. § 1517(a)(5)(A) ......................................................................................................... 22

19 U.S.C. § 1517(b)(4)(A) ...................................................................................................... 9, 23

19 U.S.C. § 1517(b)(4)(C) ......................................................................................................... 23

19 U.S.C. § 1517(c) ..................................................................................................................... 5

19 U.S.C. § 1517(c)(1)(A) .......................................................................................................... 40

19 U.S.C. § 1517(d)(1)(A) ..................................................................................................... 40, 41

19 U.S.C. § 1517(f) .................................................................................................................. 1, 5

19 U.S.C. § 1517(g)(2) ................................................................................................................. 5

19 U.S.C. § 1592 ......................................................................................................................... 26

28 U.S.C. § 1581(c) ...................................................................................................................... 1

## Regulations

19 C.F.R. § 351.225(k)(1) (2000) .......................................................................................*passim*

19 C.F.R. § 351.225(k)(2) (2000) .......................................................................................*passim*

## Legislative History

H. Rep. No. 103-361, *reprinted in* 1993 U.S.C.C.A.N. 2552, 2670-71 (1993) ................... 25, 26

ACTIVE.135866278.03

**PUBLIC VERSION**

## Administrative Determinations

CBP Administrative Review Determination, EAPA Case. No. 7251, Worldwide Door
    Components, Inc. (Jan. 30, 2020) ............................................................. 8 n.1

*Certain Steel Grating from China*, Inv. Nos. 701-TA-465 and 731-TA-1161 (Final), USITC Pub.
    4168 (July 2010) .................................................................................. 18, 19

*Certain Steel Grating from the People's Republic of China: AD Order*, 57 Fed. Reg. 43,143
    (Dep't of Commerce July 23, 2010) ............................................................. 12

*Certain Steel Grating from the People's Republic of China: CVD Order*, 57 Fed. Reg. 43,144
    (Dep't of Commerce July 23, 2010) ............................................................. 12

*Common Alloy Aluminum Sheet from Bahrain, Brazil, Croatia, Egypt, Germany, India,
    Indonesia, Italy, Oman, Romania, Serbia, Slovenia, South Africa, Spain, Taiwan and the
    Republic of Turkey: AD Orders*, 86 Fed. Reg. 22,139 (Apr. 27, 2021)........................ 13

Final Scope Ruling on Schletter Grounding Clamps, A-570-967, at 3 (Aug. 10, 2020), ACCESS
    bar code 4013921-01................................................................................. 13

## Other Materials

Antidumping and Countervailing Duties (AD/CVD) Frequently Asked Questions, available at:
    https://www.cbp.gov/trade/priority-issues/adcvd/antidumping-and-countervailing-duties-
    adcvd-frequently-asked-questions (last accessed December 18, 2019)...................... 8 n.1

3 Charles H. Koch, Jr., *Administrative Law and Practice* § 9.24{1} (3d ed. 2022).................. 32

8A West's Fed. Forms, National Courts § 3.6 (5th ed. 2021) .................................... 32

ACTIVE.135866278.03

PUBLIC VERSION

RULE 56.2 STATEMENT

**Administrative Determination Sought To Be Reviewed**

1.        In this action, Plaintiffs Ikadan System USA, Inc. ("Ikadan") and Weihei Gaosai Metal

Product Co., Ltd. ("Gaosai") ask the Court to review determinations by U.S. Customs and

Border Protection ("CBP") that Ikadan and Gaosai entered merchandise covered by the U.S.

Department of Commerce ("Commerce") antidumping ("AD") and countervailing duty ("CVD")

orders on certain steel grating from China (the "AD/CVD Orders") through evasion.  The

determinations at issue include an initial determination by CBP, Trade Remedy Law

Enforcement Directorate ("TRLED"), TRLED Determination, CR 123 (June 21, 2021), and a

subsequent *de novo* Administrative Review Determination by CBP's Office of Regulations and

Rulings, PD 80 (Oct. 26, 2021), pursuant to Section 517(f) of the Tariff Act of 1039, 19 U.S.C. §

1517(f).  This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. §

1581(c).

**Issues of Law Together With the Reasons for Contesting the Administrative Determination.**

2.        **Issue:** Was CBP's interpretation of the scope of the AD/CVD Orders to include not only

all steel grating, but also all downstream products that include steel grating as an input, arbitrary

and capricious and not in accordance with law?

3.        **Answer**: Yes, CBP's interpretation of the scope of the AD/CVD Orders was arbitrary and

capricious and not in accordance with law.  The scope of the Orders covers imports of steel

grating from China, but it does not include imports of downstream products, such as pig

farrowing crates or farrowing flooring systems, even if those downstream products include steel

grating as an input.

4.      **Issue:** Was CBP's determination that Ikadan and Gaosai "evaded" the AD/CVD Orders not in accordance with law?

5.      **Answer:** Yes, CBP's determination that Ikadan and Gaosai "evaded" the AD/CVD Orders was not in accordance with law.  The plain meaning of the term "evasion" in EAPA requires at least some level of culpability, yet CBP unlawfully claims that it need not establish any level of culpability.  The result is that CBP's unlawful interpretation of the statute usurps the exclusive role of Commerce to resolve good-faith disagreements as to the scope of AD/CVD orders.

6.      **Issue:** Was CBP's determination to suspend liquidation of all unliquidated entries imported by Plaintiffs that include farrowing crates (past and future), and to impose AD/CVD cash deposit requirements on all such entries, arbitrary and capricious?

7.      **Answer:** Yes, CBP's determination was arbitrary and capricious, because it assigned AD/CVD cash deposits to Plaintiffs' imports that do not contain any tribar.


**ARGUMENT**

**I.      CBP'S INTERPRETATION OF THE SCOPE OF THE AD/CVD ORDERS IS NOT IN ACCORDANCE WITH LAW, OR IS ARBITRARY AND CAPRICIOUS, BECAUSE CBP'S INTERPRETATION INCLUDES NOT ONLY STEEL GRATINGS, BUT ALSO INCLUDES ALL DOWNSTREAM PRODUCTS THAT USE STEEL GRATINGS AS AN INPUT.**

The argument that Plaintiffs raise in Section I of this brief is that CBP's affirmative EAPA determination is premised *entirely* on CBP's interpretation of the scope of the AD/CVD Orders.  Plaintiffs contend that CBP's interpretation of the scope is not in accordance with law because the plain language of the AD/CVD Orders include only steel grating, and do *not* include further manufactured downstream products that are produced with steel grating as an input.  Furthermore, even if the Court were to determine that CBP's interpretation does not violate the

ACTIVE.135866278.03

**PUBLIC VERSION**

plain language of the AD/CVD Orders, the Court should nevertheless determine that CBP's

interpretation is unsupported by substantial evidence, because CBP failed to consider any of the

source materials that Commerce is required to consider in its own scope rulings.

### A.   Relevant Factual Background

Plaintiff Gaosai is a Chinese manufacturer in the animal husbandry industry.  Gaosai RFI

Response, CR 18 (Nov. 13, 2020), at 12.  Gaosai manufactures pig fence design services and

products.  *Id*.  Plaintiff Ikadan is a U.S. company that imports from Gaosai certain pig farrowing

crates.  Ikadan RFI Response, CR 53 (Nov. 13, 2020), at 3.  The pig farrowing crates that Ikadan

imports from Gaosai frequently contain numerous components, including ductile cast iron

flooring.  *Id*.  In a few instances, the components include a tribar galvanized steel floor.  *Id*.

There are no Ikadan standard farrowing crates imported from a product list; instead, all items are

custom fabricated according to customer requirements and specifications for the pig producer.

*Id*.  In some instances, Gaosai acts as the importer of record for its customers.  Gaosai RFI

Response, CR 18 (Nov. 13, 2020), at 2.  When Gaosai acts as importer of record, its imports

from China may include farrowing crates, gestation stalls, gating, hospital stalls, and stanchions.

*Id*. at 3.  The farrowing crates that Gaosai imports consist of a combination of some or all of the

following: tribar flooring, cast iron flooring, PVC panel, stainless steel feeder, and plastic

hopper.  *Id*.

On March 27, 2020, Hog Slat, Inc. ("Hog Slat") filed an allegation with CBP, contending

that Ikadan was importing certain steel grating of Chinese origin, specifically galvanized tribar

floor products, into the United States by transshipment through South Korea and/or

misclassification to evade the payment of AD and CVD duties in connection with the Orders.

Hog Slat Allegation Against Ikadan, CR 1 (Mar. 27, 2020), at 7, 10 (transshipment allegation) &

8-9 (misclassification allegation).  On April 29, 2020, Hog Slat supplemented its allegation and

3

provided the name of Gaosai as an additional importer.  Hog Slat Allegation Against Gaosai, CR 2 (Apr. 29, 2020), at 8, 10 (transshipment allegation) & 8-10 (misclassification allegation).

TRLED initiated a consolidated EAPA investigation of Ikadan and Gaosai on June 16, 2020.  TRLED Confidential Initiation Memo, CR 13 (June 16, 2020).  TRLED informed Ikadan and Gaosai of the initiation on September 18, 2020.  TRLED Notice of Initiation and Interim Measures, CR 14 (Sept. 18, 2020).

TRLED issued Request for Information ("RFI") questionnaires to Ikadan and Gaosai on October 14, 2020 and October 15, 2020, respectively.  Ikadan RFI, CR 15 (Oct. 14, 2020); Gaosai RFI, CR 17 (Oct. 15, 2020).  Ikadan and Gaosai responded to the initial RFIs on November 13, 2020.  Gaosai RFI Response, CR 18 (Nov. 13, 2020); Ikadan RFI Response, CR 53 (Nov. 13, 2020).

On November 13, 2020, Gaosai submitted a scope request to Commerce, asking Commerce to issue a scope ruling confirming that imports of pig farrowing crates, which contain numerous components, including flooring that is partly made of galvanized bar, are outside the scope of the Orders.  Gaosai also asked Commerce to issue a scope ruling confirming that imports of farrowing flooring systems, which may be made partly of galvanized bars, are outside the scope of the Orders.  Commerce initially rejected Gaosai's scope ruling request, but Gaosai submitted an amended scope request on February 5, 2021, which Commerce accepted.  Gaosai Scope Ruling Request to Commerce, PR 34(b) (Feb. 5, 2021).  TRLED placed Gaosai's scope ruling request to Commerce on the record of the EAPA investigation on February 16, 2021. TRLED Memo Adding Gaosai Amended Scope Ruling Request, PR 34(a) (Feb. 16, 2021).

On April 21, 2021, Ikadan and Gaosai submitted written arguments to TRLED. Ikadan/Gaosai Written Argument, CR 41 (Apr. 19, 2021).

4

**PUBLIC VERSION**

On June 21, 2021, TRLED, determined that there was "substantial evidence" that Ikadan and Gaosai entered merchandise covered by the Orders through evasion.  TRLED Determination, CR 123 (June 21, 2021).  TRLED's determination includes a finding that "the tribar floors portion of the imported farrowing crate systems is covered merchandise."  *Id*. at 8.

On August 3, 2021, Gaosai and Ikadan separately requested that CBP conduct an administrative review of TRLED's determination, pursuant to 19 U.S.C. § 1517(f).  Gaosai Amended Administrative Review Request, CR 126 (Aug. 3, 2021); Ikadan Amended Administrative Review Request, CR 127 (Aug. 3, 2021).

On October 26, 2021, CBP issued its administrative review determination, affirming TRLED's June 21, 2021 initial determination.  Administrative Review Determination, PD 80 (Oct. 26, 2021).

    **B.**    **Standard of Review.**

        **1.**    **The Standard of Review in the Case of Interpretation of the Scope of AD/CVD Orders.**

EAPA directs the Court to determine whether a determination issued pursuant to 19 U.S.C. § 1517(c) or an administrative review issued pursuant to 19 U.S.C. § 1517(f) was "conducted in accordance with those subsections."  19 U.S.C. § 1517(g)(1).  In so doing, the Court "shall examine … whether {CBP} fully complied with all procedures under sections (c) and (f)" and "whether any determination, finding, or conclusion is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  *Id*. § 1517(g)(2).

"'The court's review of Customs' determination as to evasion may encompass interim decisions subsumed into the final determination.'"  *Diamond Tools Tech. LLC v. United States*, 45 CIT ___, 545 F. Supp. 3d 1324, 1331 (2021) (quoting *Vietnam Firewood Co. Ltd. v. United States*, 44 CIT ___, 466 F. Supp. 3d 1273, 1284 (2020)).  Thus, CBP's determination

ACTIVE.135866278.03

**PUBLIC VERSION**

encompasses both the June 21, 2021 TRLED determination and CBP's October 26, 2021 administrative review determination.

In general, the Court determines whether an agency action is "in accordance with law" based on the two-prong test established in *Chevron, USA., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984); *see also Icdas Celik Enerji Tersane ve Ulasim Sanayi, A.S. v. United States*, 44 CIT ___, 426 F. Supp. 3d 1353, 1357 (2020).  Under the first prong, the Court examines whether the statute unambiguously addresses the "precise question at issue" in the case.  *Id*. (quoting *Chevron*, 467 U.S. at 843).  If the answer to that question is "yes, 'that is the end of the matter,' and {the Court} must give effect to the unambiguously expressed intent of Congress.'"  *Id*. (quoting *Apex Frozen Foods Private Ltd. v. United States*, 862 F.3d 1322, 1329 (Fed. Cir. 2017) and *Chevron*, 467 U.S. at 842-43).  Only where "the statute is silent or ambiguous with respect to the specific issue" does the Court evaluate the agency's interpretation of the statute.  *See id*.

Plaintiffs are not aware of any caselaw addressing the standard of review for CBP in its interpretation of AD/CVD Orders that were created and are administered by Commerce. However, in reviewing a determination by *Commerce* interpreting the scope of *its own* AD/CVD orders, the Court upholds a Commerce ruling that is supported by "substantial evidence" and is otherwise "in accordance with law."  *Whirlpool Corp. v. United States*, 890 F.3d 1302, 1307 (Fed. Cir. 2018).  The Federal Circuit has explained the interpretive process as follows:

> Commerce's inquiry begins with the Orders' scope to determine whether it contains an ambiguity and, thus, is susceptible to interpretation.  The question of whether the unambiguous terms of a scope control the inquiry, or whether some ambiguity exists, is a question of law that we review de novo.  If the scope is unambiguous, the plain meaning of the Orders' language governs. The question of whether a product meets the unambiguous scope terms then presents a question of fact reviewed for substantial evidence.

6

*Id*. (citations omitted).  The Federal Circuit elaborated on its interpretive process in *OMG, Inc. v. United States*:

> The first step in a scope ruling proceeding is to determine whether the governing language is in fact ambiguous.  If it is not ambiguous, the plain meaning of the language governs.  But if the language is ambiguous, Commerce must next consider the regulatory history, as contained in the so-called "(k)(1) materials."  If the (k)(1) materials are not dispositive, Commerce then considers the (k)(2) criteria.

*OMG, Inc. v. United States*, 972 F. 3d 1358, 1363 (Fed. Cir. 2020).  In the absence of any statutory guidance and precedent to the contrary, the Court here should apply the same standard of review that it would to a scope ruling by Commerce, except as discussed below.

> **2.**      **The Court Owes No Special Deference to CBP's Interpretation of the AD/CVD Orders Because the Scope of the AD/CVD Orders Was Developed by Commerce, Not CBP.**

In this case, the Court is *not* analyzing the interpretation by *Commerce* of *its own* AD/CVD order.  Indeed, CBP stated that it did not place Commerce's scope determination on the administrative record.  Initial Determination, at 8 n.60.  In its Initial Determination, CBP asserted that "{b}ecause CBP determined that the evidence on the record clearly demonstrated that the tribar floors properly fell within the scope of the AD/CVD orders, CBP was not required to make a scope referral to DOC in this investigation."  Initial Determination, at 8.  As a result, the Court must determine how much (if any) deference it grants to an interpretation by *CBP* of an AD/CVD order that was drafted by *Commerce*, not by *CBP itself*.

The Federal Circuit has long held that "only Commerce can interpret and clarify the scope of an antidumping duty order."  *United Steel & Fasteners, Inc. v. United States*, 947 F.3d 794, 803 (Fed. Cir. 2020).  The Federal Circuit has explained that "we give substantial deference to Commerce's interpretation of its own duty orders because the meaning and scope of those orders are issues particularly within the expertise and special competence of Commerce."

ACTIVE.135866278.03

**PUBLIC VERSION**

*Sunpreme Inc. v. United States*, 946 F.3d 1300, 1309 (Fed. Cir. 2020) (*en banc*) (cleaned up);

*See also United Steel & Fasteners*, 947 F.3d at 798 ("{w}e have consistently emphasized that

Commerce is entitled to substantial deference when interpreting its own antidumping duty orders

because the meaning and scope of such orders is within Commerce's particular expertise and

special competence"); *Whirlpool Corp.*, 890 F.3d at 1308 ("[ ]ecause the meaning and scope of

the Orders are issues particularly within Commerce's expertise and special competence, we grant

Commerce substantial deference with regard to its interpretation of its own Orders"); *Sandvik

Steel Co. v. United States*, 164 F.3d 596, 599 (Fed. Cir. 1998) (stating that "[ ]ince Commerce

drafted the antidumping order, the order's meaning and scope are issues particularly within the

expertise of that agency").[1]

There is no specific statutory provision in EAPA that instructs how CBP is to interpret

the scope of the AD/CVD Orders, and EAPA does not grant CBP the authority to develop its

own set of criteria in determining whether a particular product falls within the scope of an

AD/CVD order established by Commerce.

Under a situation where the agency does *not* have rulemaking powers to develop

interpretive rules for a statute that it does *not* administer, courts are not required to defer to the

agency.  *See Merck & Co., Inc. v. Kessler*, 80 F.3d 1543, 1549-50 (Fed. Cir. 1996) (holding that

rulemaking powers of Patent and Trademark Office did not authorize the PTO to issue

substantive rules and therefore did not merit *Chevron*-type deference, which applies only to an

---

[1] Indeed, CBP itself, in the context of its own administrative review of its evasion ruling in
another case, has stated that "'Commerce is the agency that issues final rulings regarding what
merchandise is subject to an AD/CVD order.'"  CBP Administrative Review Determination,
EAPA Case. No. 7251, Worldwide Door Components, Inc. (Jan. 30, 2020), at 18 & n.54
(quoting Antidumping and Countervailing Duties (AD/CVD) Frequently Asked Questions,
available at: https://www.cbp/gov/trade/priority-issues/adcvd/antidumping-and-countervailing-
duties-adcvd-frequently-asked-questions (last accessed December 18, 2019)).

agency authorized to promulgate substantive rules under a statute it is charged with administering).  Here, EAPA does provide that if CBP is unable to determine whether the merchandise at issue is "covered merchandise," CBP "shall" "refer the matter to" Commerce "to determine whether the merchandise is covered merchandise pursuant to the authority of" Commerce "under subtitle IV."[2]  19 U.S.C. § 1517(b)(4)(A).  But even in a situation where CBP claims to be able to make a scope determination without the aid of Commerce, EAPA does not grant CBP *carte blanche* to develop *its own rules* for interpreting the scope of AD/CVD orders, and thus this Court is *not* required to confer *Chevron*-like deference to CBP's independent scope interpretations.  At most, this Court can credit CBP's scope interpretations only to the extent that they possess the "power to persuade."  *Merck*, 80 F.3d at 1550 (citing *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)).  In sum, the Court should not grant any meaningful deference to CBP's interpretation of the scope of the AD/CVD Orders.  As discussed further below, applying the relevant standard of review, the Court should reject CBP's scope interpretation and, as a result, its finding of evasion cannot stand.

### C.    CBP's Interpretation of the Scope Is Contrary to the Plain Language of the AD/CVD Orders and Therefore Is Not in Accordance With Law.

The only explanation by CBP in its Initial Determination as to why it concluded that Ikadan's and Gaosai's imports of pig farrowing crates and farrowing flooring systems are within the scope of the AD/CVD Orders is as follows:

> After reviewing all the evidence on the record, CBP found that the tribar floors portion of the imported farrowing crate systems is covered merchandise. Because CBP determined that the evidence on the record clearly demonstrated that the tribar floors properly fell within the scope of the AD/CVD orders, CBP was not required to make a scope referral to DOC in this investigation.  CBP determined that the galvanized tribar floors fell within the scope of the

---

[2] "Subtitle IV" refers to Subtitle IV of the Tariff Act of 1930, as amended, which covers countervailing and antidumping duties.

ACTIVE.135866278.03

PUBLIC VERSION

> AD/CVD orders because the tribar floors are made with [
> ], making it a product of two or more
> pieces of steel joined together by welding.  The scope of the AD/CVD orders
> covers "certain steel grating, consisting of two or more pieces of steel,
> including load-bearing pieces and cross pieces, joined by any assembly
> process…;" thus, the tribar floors meet the scope definition.  Also, the scope
> does not include any exclusions that apply to the tribar floors.
>
> The RFI responses show that *tribar floors are an [                ] of the
> farrowing crate systems being imported into the United States* and that the
> Importers regularly import tribar floors, listing them under the description
> "parts for farrowing crates" rather than separately listing the tribar floors and
> declaring them as subject to the AD/CVD orders.  CBP entry data confirms
> this as well. Thus, substantial evidence on the record indicates that the
> Importers entered tribar floors, which is covered merchandise, into the customs
> territory of the United States through evasion.

TRLED Determination, CR 123 (June 21, 2021), at 8 (emphasis added).

CBP's rationale in its Administrative Review Determination is even less illuminating

than the Initial Determination.  CBP's only discussion of the subject is as follows:

> CBP found that it was able to determine that tribar floors are covered
> merchandise based upon the contents of the record without a scope referral to
> Commerce and explained the reasoning behind this finding in the June 21
> Determination.  Specifically, CBP found, based upon the evidence in the
> administrative record, that the way the tribar floors are constructed would
> place them within the scope of the AD/CV duty orders and that no exclusions
> apply to the tribar floors.

Administrative Review Determination, PD 80 (Oct. 26, 2021), at 9.

    1.    **CBP's Finding of Evasion Is Premised Entirely on the Unsupported Assertion That Plaintiffs' Imports of Pig Farrowing Crates and Farrowing Flooring Systems Are Within the Scope of the Orders Because This Merchandise May Include Steel Grating as an Input.**

Again, to be clear, Ikadan and Gaosai do not import (and did not import during the period

examined) steel grating as such.  Instead, Ikadan and Gaosai import pig farrowing crates and

farrowing flooring systems.  This is clear from Ikadan's and Gaosai's written argument to

TRLED, which stated as follows:

ACTIVE.135866278.03

**PUBLIC VERSION**

> {t}he farrowing flooring systems with tribar truss flooring is {sic} *downstream* products dedicated to a particular use that are made of several components, including tribar floor that, *if it had been imported by itself in a semi-finished form of bar lengths welded in a cross-section pattern*, might be considered to be subject steel grating.  But … Gaosai does not sell or import the semi-finished tribar input.  Unlike steel grates, the tribar floor has been further manufactured into a downstream product through the self-supporting truss system consisting of leg fixtures made of flat steel angles and the bottom supports made of steel flat bar.  The tribar floor with the truss system is then attached to the *cast iron* flooring to comprise the farrowing floor system as a whole.  The tribar truss flooring is specifically designed for the farrowing crate and to accommodate the cast iron floor.  Gaosai only sells the tribar floor as a component of the farrowing crate flooring system with the cast iron floor.  The farrowing crate flooring system, in turn, may be imported separately or imported together with the pig farrowing crate.  Thus, the further manufactured tribar truss flooring, and *a fortiori* the farrowing flooring system, is simply not steel grating based on the plain language of the Orders.  The farrowing floor system as a whole, and even the tribar truss flooring component itself, constitutes a downstream, out-of-scope product.

Ikadan/Gaosai Written Argument, CR 41 (Apr. 19, 2021) at 20 (emphasis original).

To aid the Court's understanding of the pig farrowing crates and farrowing flooring systems at issue, appended to this Memorandum of Points and Authorities is **Annex 1**, which provides a description of an example farrowing crate configuration consisting of a galvanized steel crate with stainless steel feeder; and a pig flooring deck, which in this case includes both a ductile cast iron floor and a galvanized pig tri-bar floor.  Gaosai RFI, CR 20 (Nov. 13, 2020), Exhibit WG-3.  **Annex 1** also includes illustrations showing the function of farrowing crates generally; the function and production of a particular pig floor deck with a tri-bar floor; fasteners to secure the ends of the tribar floor to the pig house; the cast iron floor; the galvanized steel crate and stainless steel feeder; the gating; layouts of a gestation stall, a hospital stall, and a stanchion.  Pictures of the tribar truss system, viewed at different angles, are appended to this Memorandum of Points and Authorities as **Annex 2**.  Ikadan/Gaosai Written Argument, CR 41 (Apr. 19, 2021) at 25-26.

11

It is indisputable that pig farrowing crates and farrowing flooring systems are not steel grating *per se*, any more than an automobile is a piece of steel.  Steel grating is an *input* used in the production of certain pig farrowing crates and certain farrowing flooring systems.  CBP's determination of evasion in this case, therefore, necessarily depends on its assertion that imports of pig farrowing crates and farrowing flooring systems that contain tribar flooring as an input are within the scope of the AD/CVD Orders because the tribar flooring is itself an "[

] of the farrowing crate systems being imported into the United States." TRLED Determination, CR 123 (June 21, 2021), at 8.

> **2.      CBP Is Wrong in Claiming that Because the Upstream Steel Grating Is Within the Scope, the Downstream Pig Farrowing Crates and Farrowing Flooring Systems Are Perforce Within the Scope.**

CBP's claim that Ikadan's and Gaosai's pig farrowing crates and farrowing flooring systems are within the scope of the AD/CVD Orders fails because the use of steel grating as an input simply does *not* mean, as a matter of law, that the finished product is itself within the scope of the AD/CVD Orders, regardless of whether the input is an "[                           ]" of the finished product.  Gaosai discussed this point in detail in its written argument to CBP.  Ikadan/Gaosai Written Argument, CR 41 (Apr. 19, 2021), at 17-20.

There is nothing in the scope language of the AD/CVD Orders that says that the scope of the AD/CVD Orders includes downstream products that are manufactured with steel grating as an input.  The scope language states that products within the scope "consisting of two or more pieces of steel, including load-bearing pieces and cross pieces, joined by any assembly process …."  *Certain Steel Grating from the People's Republic of China: AD Order*, 57 Fed. Reg. 43,143 (Dep't of Commerce July 23, 2010); *Certain Steel Grating from the People's Republic of China: CVD Order*, 57 Fed. Reg. 43,144 (Dep't of Commerce July 23, 2010).  The scope language does not state that farrowing floor systems are within the scope of the Orders.

Moreover, the scope language does not stipulate that any further manufactured downstream product that includes, *as one of several inputs*, two or more pieces of steel joined by an assembly process, is included within the scope of the Orders.   When the petitioner has wanted to include downstream products in the scope of an order, the scope language specifically says so.  For example, the scope of the antidumping and countervailing duty order on aluminum extrusions from China specifically states that "{t}he subject merchandise includes aluminum extrusions that are finished (coated, painted, etc.), fabricated, or any combination thereof."  Final Scope Ruling on Schletter Grounding Clamps, A-570-967, at 3 (Aug. 10, 2020), ACCESS bar code 4013921-01.  As another example, the scope of the antidumping order on common alloy aluminum sheet specifically states the following:  "Subject merchandise includes common alloy sheet that has been further processed in a third country, including but not limited to annealing, tempering, painting, varnishing, trimming, cutting, punching, and/or slitting, or any other processing that would not otherwise remove the merchandise from the scope of these orders if performed in the country of manufacture of the common alloy sheet."  *Common Alloy Aluminum Sheet from Bahrain, Brazil, Croatia, Egypt, Germany, India, Indonesia, Italy, Oman, Romania, Serbia, Slovenia, South Africa, Spain, Taiwan and the Republic of Turkey: AD Orders*, 86 Fed. Reg. 22,139, 22,143 (Apr. 27, 2021).  For the same reason, the scope language unambiguously demonstrates that Gaosai's farrowing floor systems fall outside the scope of the Orders.

This Court has previously rejected the notion that any product within the scope of an antidumping duty order automatically continues to be within the scope following further manufacture into a distinct downstream product unless specifically excluded in the scope language.  In *Stein Industries Inc. v. United States*, 43 CIT ___, 365 F. Supp. 3d 1364 (2019), an importer (named Carlson) requested that Commerce determine whether certain finished

13

components of refrigerated merchandising and display structures are within the scope of

antidumping and countervailing duty orders on light-walled rectangular pipe and tube ("LWR")

from China.  *Id*. at 1367.  Carlson argued that plain language of the scope does not include

finished components of refrigerated merchandising and display structures.  *Id*. at 1368.  Carlson

acknowledged that its imports contained "structural steel bars" as inputs that would be covered

by the scope, but that the imports entered as *finished downstream components* made from LWR,

and were not LWR as such.  *Id*.

In that case, Commerce rejected Carlson's argument that pre-importation processing

removed the products from the scope of the LWR orders, on the grounds that "'{p}roducts that

meet the description of subject merchandise in the scope are covered unless explicitly excluded

from the scope,' and the relevant scope did not contain exclusionary language."  *Id*. at 1369

(quoting Commerce's original scope determination).

The CIT in *Stein Industries* rejected Commerce's position, stating as follows:

> Commerce further erred in its analysis of Carlson's argument that the scope
> does not cover downstream products made with subject LWR pipes or tubes.
> Commerce asserted that Carlson's products are not "outside the scope of the
> *Orders* because they may be used, or are intended to be used, in 'certain
> finished components of refrigerated merchandising and display structures.'"
> Final Scope Ruling at 8.  Carlson argued, however, that its product *are* "certain
> finished components of refrigerated merchandising and display structures,"
> Scope Req. at 1, and, thus, consisted of "*downstream products* dedicated to
> particular uses as components of refrigerated merchandising and display
> structures," Suppl. Scope Req. at 9 (emphasis added).

*Id*. at 1372 (emphasis original).

The situation regarding Gaosai's farrowing floor systems with tribar truss flooring is

highly analogous to the facts in *Stein Industries*.  As in *Stein Industries*, a farrowing floor system

with tribar truss flooring is not steel grating.  Instead, a farrowing flooring system with tribar

truss flooring is a *downstream product* dedicated to a particular use that are made of several

14

components, including tribar that, *if it had been imported by itself in a semi-finished form of bar lengths welded in a cross-section pattern*, might be considered to be subject steel grating. But Gaosai's scope ruling request was not about the semi-finished product because Gaosai does not sell or import the semi-finished tribar input. Unlike steel grates, the tribar has been further manufactured into a downstream product through the self-supporting truss system consisting of leg fixtures made of flat steel angles and the bottom supports made of steel flat bar. The tribar truss flooring is then attached to the *cast iron* flooring to comprise the farrowing floor system as a whole. The tribar truss flooring is designed specifically for the farrowing crate and to accommodate the cast iron floor. Gaosai only sells the tribar truss flooring as a component of the farrowing crate flooring system with the cast iron floor. The farrowing crate flooring system, in turn, may be imported separately or imported together with the pig farrowing crate. Thus, the further manufactured tribar truss flooring, and *a fortiori* the farrowing flooring system, is simply not steel grating based on the plain language of the Orders. The farrowing floor system as a whole, and even the tribar truss flooring component itself, constitutes a downstream, out-of-scope product.

Although CBP states that "no exclusions apply to the tribar floors," Administrative Review Determination, at 9, CBP "cannot find authority in an order based on the theory that the order does not deny authority." *Duferco Steel, Inc. v. United States*, 296 F.3d 1087, 1096 (Fed. Cir. 2002). Here, there is no language in the AD/CVD Orders that is subject to interpretation, and CBP cannot modify the AD/CVD Orders to include downstream products that were not within the scope of the AD/CVD Orders. *See id.* at 1097, 1098 (stating that "a predicate for the interpretive process is language in the order that is subject to interpretation" and that "Congress

ACTIVE.135866278.03

**PUBLIC VERSION**

made no provision for bringing other merchandise within the scope of antidumping and countervailing duty orders that was otherwise outside the language of those orders").

This Court has previously held, in *Trendium Pool Products, Inc. v. United States*, that the scope of an AD/CVD order does not automatically include downstream products. In *Trendium*, the Court addressed the issue of whether imported finished pool kits and pool walls, which were imported in a condition ready to construct into above ground pools with no further modification by customers, and which were partially made from corrosion-resistant steel covered by antidumping duty orders, were themselves within the scope of the antidumping duty orders. 43 CIT ___, 399 F. Supp. 3d 1335, 1337 (2019). The Court held that the downstream product was *not* covered within the scope of the antidumping duty orders on the input corrosion-resistant steel. "In this case …, there is nothing on the record of the original investigation that demonstrates that Petitioners intended to include fully finished downstream products as part of the scope of the investigation." *Id*. at 1342. "{B}ecause the plain language of the *Order* does not discuss downstream products and the Government can point to no evidence on the record of consideration of downstream products within the *Petition* filed with Commerce or the ITC investigation, they are reasonably interpreted to be excluded from the scope of the *Order*." *Id*. "Pools are a product that is absent from the plain language of the *Order* and not considered in the record as within the scope of the *Order*. As such, the processing is sufficient to bring Trendium's product outside the scope of the *Order*." *Id*. at 1344 (2019).

The same is true with respect to Ikadan's and Gaosai's pig farrowing crates and farrowing flooring systems. The plain language of the AD/CVD Orders nowhere mentions pig farrowing crates, farrowing flooring systems, or *any* downstream products. CBP points to nothing that would bring them within the scope of the AD/CVD Orders just because they are

16

downstream products that may use steel grating as an input.  As shown above in the discussion of

the AD/CVD orders on aluminum extrusions from China, and on common alloy sheet from

several countries, Commerce knows how to write scope language broadly to include downstream

articles.  This should end the matter and compel a conclusion that CBP's interpretation of the

scope is not in accordance with law, and therefore CBP's finding of evasion is arbitrary and

capricious, and is unsupported by substantial evidence.

> **D.**     **Even If the Scope Language Were Ambiguous, CBP's Interpretation of the Scope Is Arbitrary and Capricious Because CBP Failed to Consider the Record Evidence That Commerce Is Required To Take Into Account in Interpreting Ambiguous Scope Language.**
>
>> **1.**     **CBP Failed to Address Plaintiffs' Points That the Descriptions of the Merchandise Contained in the Original Petitions, Commerce's Investigation, and the Commission's Injury Investigation Show That Plaintiffs' Pig Farrowing Crates and Farrowing Flooring Systems Fall Outside the Scope of the Orders.**

Moreover, even if the scope of the Orders were ambiguous—which it is not—the next

step for the Court would be to determine whether CBP's interpretation of the Orders is

reasonable.  For a scope determination by Commerce, the Court would determine whether

Commerce's interpretation would be consistent with the regulatory history, as contained in the

so-called "(k)(1) materials".  *See* 19 C.F.R. § 351.225(k)(1) (2020) (Commerce regulation

identifying primary interpretive sources).  If the (k)(1) materials were not dispositive, the Court

would determine whether Commerce considered the (k)(2) criteria.  *See* 19 C.F.R. §

351.225(k)(2) (2020) (Commerce regulation establishing five-factor test); *see also OMG, Inc. v.

United States*, 972 F.3d 1358, 1363 (Fed. Cir. 2020) (discussing step-by-step approach to

reviewing Commerce scope rulings).  Given that CBP has promulgated no regulations and has

developed no consistent past practice in interpreting ambiguous scope language of AD/CVD

Orders, this Court should apply the same analytical steps that it would if reviewing a scope

ACTIVE.135866278.03

determination by Commerce.  In this case, however, CBP interpreted the scope of the AD/CVD

Orders without taking into account any of the "(k)(1)" regulatory history materials that are on the

record in this investigation, and without taking into account any of the factual background such

as physical characteristics, etc., that Commerce would have done in a "(k)(2)" analysis.  Even if

this Court were to hold that CBP is not bound by the (k)(1) and (k)(2) Commerce regulations, in

this case CBP has arrived at its interpretation *ipse dixit*, without any analysis whatsoever.  As

such, CBP's interpretation of the scope of the AD/CVD Orders, and the determination of evasion

that necessarily depends on that interpretation, can only be described as arbitrary and capricious.

Plaintiffs presented an analysis based on the (k)(1) materials, showing that Gaosai's pig

farrowing crates and farrowing flooring systems are not among the products that the petition on

steel grating sought to include in the Orders.  Ikadan/Gaosai Written Argument, CR 41 (Apr. 19,

2021), at 20-23.  Although the petition described numerous downstream applications of steel

grating, it did not mention pig farrowing crates or anything similar.  *Id*. at 22.  The original injury

determination of the U.S. International Trade Commission ("ITC") made clear that the ITC did

not consider the product under investigation to include downstream products that are made from

CSG.  *Id*. at 22.  The ITC explained as follows:

> CSG is a downstream steel product distinguished by two sets of components—
> the "bearing bars" that extend along the length and the "crossbars" that
> transverse (typically perpendicular to) the bearing bars to form a "panel."  CSG
> is designed to support and distribute the weight of objects, which is achieved
> through varying dimensions and spacing of both the bearing bars and cross
> bars.  As such, CSG is used in environments that require not only light and air
> filtration but load bearing and load distribution as well.  CSG is available in
> various forms including "standard welded bar grating" (crossbars welded
> across the tops of bearing bars), "press-locked steel grating" (notched bars),
> "swage-locked steel grating" (crossbars passing through and swaged or
> crimped on each side of the bearing bars), and "riveted steel grating" (pre-bent
> bars riveted between adjacent bearing bars).

ACTIVE.135866278.03

*Id.* (quoting *Certain Steel Grating from China*, Inv. Nos. 701-TA-465 and 731-TA-1161 (Final), USITC Pub. 4168 (July 2010), at 5).

Finally, unlike steel grating, the farrowing flooring system at issue has a truss that is specifically designed for the flooring system for the farrowing crates.  None of the (k)(1) sources—the petition, the investigation, and the ITC reports—mention anything about steel grates that are further manufactured into a truss, much less with the truss further attached to cast iron flooring into a farrowing floor system.  Ikadan/Gaosai Written Argument, CR 41 (Apr. 19, 2021), at 23.  *See* descriptions and pictures in **Annexes 1 and 2**.

Although Plaintiffs demonstrated that these (k)(1) factors point toward the conclusion that pig farrowing crates and farrowing flooring systems fall outside the scope of the Orders, CBP does not discuss these factors, either in the Interim Determination (*see* TRLED Notice of Initiation and Interim Measures, CR 14 (Sept. 18, 2020)), or in the Administrative Review (*see* Administrative Review Determination, PD 80 (Oct. 26, 2021)).  Thus, if the Court does not conclude that the Orders unambiguously exclude pig farrowing crates and farrowing flooring systems, the Court cannot affirm CBP's determination and must remand on the grounds that CBP has not considered the (k)(1) factors in its determination regarding the scope of the Orders.  *See Saha Thai Steel Pipe Public Co., Ltd. v. United States*, 45 CIT ___, 547 F. Supp. 3d 1278, 1290 (2021) (stating that "when 'reviewing the plain language of a duty order, Commerce must consider' the (k)(1) materials") (quoting *Meridian Prod. v. United States*, 890 F.3d 1272, 1277 (Fed. Cir. 2018)); *Saha Thai*, 547 F. Supp. 3d at 1295, 1299 (holding that (k)(1) factors did not support Commerce's interpretation, and remanding for further consideration for lack of substantial evidence).

ACTIVE.135866278.03

PUBLIC VERSION

2.   **CBP Failed to Address Plaintiffs' Arguments That Commerce's Five-Factor Test Leads to the Conclusion That Plaintiffs' Pig Farrowing Crates and Farrowing Flooring Systems Fall Outside the Scope of the Orders.**

In the administrative proceedings, Plaintiffs demonstrated that application of the five-factor "*Diversified Products*" test, as set forth in 19 C.F.R. § 351.225(k)(2), also leads to the conclusion that Plaintiffs' pig farrowing crates and farrowing flooring systems fall outside the scope of the Orders.  Plaintiffs first demonstrated that the physical characteristics of in-scope steel grating is distinct from pig farrowing crates or farrowing floor systems.  Ikadan/Gaosai Written Argument, CR 41 (Apr. 19, 2021), at 24-27.  Second, Plaintiffs showed that the expectations of the ultimate purchasers of steel grating is to provide heavy load-bearing applications, such as motor vehicle traffic.  *Id*. at 27.  In contrast, Plaintiffs' pig farrowing crates and farrowing flooring systems are designed for the raising of pigs by pig farmers, providing a place for pigs to have a cool, non-slip surface to stand on.  *Id*.  The ultimate use of steel grating versus pig farrowing crates and farrowing flooring systems differ for essentially the same reasons.  *Id*. at 27-28.  The channels of trade differ.  While steel grating is typically sold through service centers and distributors, pig farrowing crates and farrowing flooring systems are sold direct to pig producers or to turnkey building companies specializing in construction of pig production facilities.  *Id*. at 28.  Finally, the manner in which steel grating is marketed and advertised contrasts with the manner in which pig farrowing crates and farrowing floor systems are marketed and advertised.  *Id*.

Again, CBP does not discuss these factors, either in the Interim Determination (*see* TRLED Notice of Initiation and Interim Measures, CR 14 (Sept. 18, 2020)), or in the Administrative Review (*see* Administrative Review Determination, PD 80 (Oct. 26, 2021)).  As with CBP's failure to discuss the (k)(1) factors, this Court cannot affirm CBP's interpretation of

the scope of the Orders given that CBP has also failed to discuss the (k)(2) factors. This fact also requires the Court to remand CBP's EAPA determination. *See Diamond Sawblades Mfrs. Coalition v. United States*, 43 CIT ___, 405 F. Supp. 3d 1345, 1358 (2019) (remanding Commerce scope determination to consider (k)(2) factors).

 In short, even if the Court were to hold that CBP's interpretation does not violate the plain language of language of the AD/CVD Orders and therefore render the entire EAPA determination as not in accordance with law, the Court still should remand on the grounds that CBP's interpretation of the scope language is arbitrary and capricious because it ignores all of the record evidence necessary for CBP to arrive at a reasonable interpretation of the AD/CVD Orders, and thus to arrive at a reasonable conclusion regarding its determination of "evasion."

## II. CBP'S FINDING OF "EVASION" BY IKADAN AND GAOSAI IS BASED ON AN UNLAWFUL INTERPRETATION OF WHAT CONSTITUTES "EVASION" UNDER EAPA.

 The argument that Plaintiffs raise herein in Section II of this brief is that even if the Court were to conclude that all "tribar flooring" is within the scope of the AD/CVD Orders and therefore considered to be "covered merchandise," CBP unlawfully concluded that Plaintiffs engaged in "evasion" based on an impermissible construction of the EAPA statute.

### A. Standard of Review

 As explained in Section I.B.1 above, the Court determines whether an agency action is "in accordance with law" based on the two-prong test established in *Chevron, USA., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984).

ACTIVE.135866278.03

PUBLIC VERSION

**B.      The Plain Language of EAPA Requires Some Level of Culpability for an Affirmative Determination of "Evasion."**

**1.      The Plain Meaning of the Terms "False" Material Statement and Material "Omission" Requires Some Degree of Culpability Before CBP May Determine That an Importer Engaged in Evasion.**

A determination of evasion requires a finding that covered merchandise has entered the United States by "means of any document or electronically transmitted data or information, written or oral statement, or act that is material and *false*, or any *omission* that is material." 19 U.S.C. § 1517(a)(5)(A) (emphasis supplied).

A recent decision of this Court has defined the term "false," as used in the EAPA statute, as follows:

> "False" is defined as: "Untrue … Deceitful … Not genuine; inauthentic … What is false can be so by intent, by accident, or by mistake … Wrong; erroneous …." *False*, BLACK'S LAW DICTIONARY (11th ed. 2019).  An "omission" is defined as: "A failure to do something; esp., a neglect of *duty* … {t}he act of leaving something out … {t}he state of having been left out or of not having been done … {s}omething that is left out, left undone, or otherwise *neglected*." *Omission*, BLACK'S LAW DICTIONARY (11th ed. 2019) (emphasis supplied).

*Diamond Tools Technology LLC v. United States*, 45 CIT ___, 545 F. Supp. 3d 1324, 1353 (2021).

The Court in *Diamond Tools* held that EAPA requires at least *some* level of culpability. *See id*. ("Customs' comment that it 'does not need to determine any level of culpability only that evasion occurred with entry' is unclear at best and potentially tautological").  The Court added that to read the EAPA statute as carrying no culpability requirement ignores the fact that any false statement or "omission" must be "material."  *See id*. ("the plain language of Customs' decision does not address the issue of material *omission*, or material and false statement or act, which is covered both by the statute and Customs' regulations") (emphasis original).  Finally, the

PUBLIC VERSION

Court in *Diamond Tools* indicated that the additional civil and criminal provisions of EAPA are a further sign that EAPA requires some level of culpability:

> In addition, it is notable that the potential consequences of an evasion finding by Customs extend far beyond application of the pertinent antidumping duties and include "such additional enforcement measures as the Commissioner determines appropriate," including referring the record to U.S. Immigration and Customs Enforcement for civil or criminal investigation or initiating proceedings under 19 U.S.C. § 1592 (penalties for fraud, gross negligence and negligence) and 19 U.S.C. § 1595a (aiding unlawful importation.  19 U.S.C. § 1517(d)(1)(E).  The fact that there may be additional consequences to an importer from a finding of evasion punctuates the need for Customs to provide a well-buttressed and well-reasoned explanation of its conclusion.

*Id*. at 1355 (administrative record citations omitted).

> ## 2. The Statutory Scheme Does Not Permit CBP to Use EAPA as an Alternative Forum to Commerce to Resolve Scope Issues.

The EAPA statute cannot reasonably be construed to give CBP authority to act as an alternative forum to Commerce to resolve scope issues.  In fact, Section 517(b)(4)(A) provides a means by which CBP can refer to Commerce the issue of whether merchandise that is the subject of an EAPA investigation is "covered merchandise" for purposes of EAPA.  19 U.S.C. § 1517(b)(4)(A).  Moreover, EAPA permits CBP to toll the deadline for its determination of evasion while Commerce considers a scope ruling.  *Id*. § 1517(b)(4)(C).  While this provision applies only when CBP "is unable to determine whether the merchandise at issue is covered merchandise," *id*. § (b)(4)(A), the statutory scheme of EAPA, viewed as a whole, cannot be construed as allowing CBP to issue its own scope determinations under the guise of preventing "evasion" of AD/CVD orders.

ACTIVE.135866278.03

**C.      A Reasonable Disagreement Over the Scope of the Orders Cannot Be Considered a "Material and False Statement or Act or a Material Omission" Within the Meaning of EAPA.**

In this case, CBP is impermissibly stretching its interpretation of EAPA so as to morph this case into an alternative forum for issuing a scope ruling that any downstream product manufactured from steel grating is within the scope of the Orders.

When CBP initiated this investigation, the allegation was that "Ikadan and importer Gaosai evaded the *AD/CVD Orders* through misclassification of the Tri-Bar Floor product produced by Gaosai and through transshipment of Chinese-origin steel gratings through South Korea." TRLED Memo Initiating EAPA Investigation, CR 13 (June 16, 2020), at 2. By the end of the investigation, TRLED found as follows:

> As for the allegations of transshipment from China to Korea and/or misclassification of steel grating as plastic to evade the AD/CVD orders, CBP found no evidence of either of these evasion schemes during the POI.

TRLED Determination, CR 123 (June 21, 2021), at 8.

Transshipment and/or intentional misclassification of merchandise certainly could constitute a "material and false statement or act" or a "material omission," and if CBP had found merit in either of those allegations, a finding of "evasion" within the meaning of EAPA would be justified. But here, all that CBP found was, at most, a situation where Ikadan and Gaosai interpreted the scope of the Orders to cover only steel grating, and not further manufactured downstream products that include steel grating as an input. At most, the situation here is that Plaintiffs and CBP appear to have a reasonable disagreement regarding the scope of the AD/CVD Orders.

Arguing whether a further manufactured downstream product made in part from steel grating as an input is *itself* "steel grating," when the AD/CVD Orders do not state that they include downstream products incorporating steel grating, can hardly be considered a "false

ACTIVE.135866278.03

statement" or a "material omission" that gives rise to "evasion" of the AD/CVD Orders. Moreover, the failure to declare the entries that contained tribar flooring as "Type 3" entries cannot be considered "material" where, as here, no notice existed in any of the "(k)(1)" sources that the AD/CVD Orders include downstream products made with steel grating as an input. This is not a situation where the scope language obviously was written in a manner to include downstream products, such as the AD/CVD orders on aluminum extrusions, *see supra* Section I.C.2.

As a result, Gaosai and Ikadan had no notice that their straightforward reading of the AD/CVD Orders was incorrect or unreasonable. Further, Gaosai and Ikadan had no notice that CBP might interpret the scope of the AD/CVD Orders to be so broad as to include any of their pig farrowing crate or flooring imports that contained downstream products that were further manufactured from steel grating. As discussed above, there is no ambiguity in the scope of the AD/CVD Orders that is susceptible to interpretation. Since Gaosai and Ikadan had no notice of the fact that the AD/CVD Orders allegedly included tribar flooring that incorporates steel grating, any act or omission by either company related to a good faith dispute over the scope of the AD/CVD Orders cannot be considered to be "material" and their decision to enter these downstream products without declaring them as "Type 3" entries subject to the AD/CVD Orders cannot reasonably be considered acts of "evasion" of the AD/CVD Orders.

Even assuming CBP has met its burden of establishing a "material" act or omission in this case (we assert it has not), Ikadan and Gaosai have affirmatively rebutted such a finding and demonstrated that any scope issue in this case is merely an honest, good faith disagreement between the Plaintiffs and CBP, not "evasion" *See United States v. Optrex America, Inc.*, 32 CIT 620, 630-31, 560 F. Supp. 2d 1326, 1336 (2008) (citing H. Rep. No. 103-361 at 120-21,

*reprinted in* 1993 U.S.C.C.A.N. 2552, 2670-71 (1993), which states that "an honest, good faith professional disagreement as to correct classification of a technical matter shall not be lack of reasonable care unless such disagreement has no reasonable basis (*e.g.*, snow skis are entered as water skis)").  Plaintiffs' interpretation of the scope of the AD/CVD Orders to not include its pig farrowing crates or flooring was reasonable under the circumstances.  *See*, *e.g.*, *United States v. Ford Motor Co.*, 463 F.3d 1267, 1279 (Fed. Cir. 2006) (stating that in the context of establishing the minimum level of culpability (negligence) under 19 U.S.C. § 1592, "Customs has the burden merely to show that a materially false statement or omission occurred; once it has done so, the defendant must affirmatively demonstrate that it exercised reasonable care under the circumstances").  Since Ikadan and Gaosai had a reasonable, good faith basis to believe its imported goods were not covered by the scope of the AD/CVD Orders, the failure to declare the pig farrowing crates or flooring as "Type 3" entries subject to the AD/CVD Orders is not "material."

The proper forum to resolve such a disagreement is Commerce, through the scope ruling procedure.  The improper way to address such an issue is to stretch EAPA beyond the limits that the statutory language will bear, converting a statute that is designed to address *evasion* into an alternative forum to usurp Commerce's exclusive role of resolving issues concerning the scope of AD/CVD orders that it implements.  CBP's attempt to do so here is not in accordance with law.

As a result, the Court should conclude that CBP's interpretation of the "evasion" requirement in the EAPA statute is not in accordance with law.  The Court should therefore remand CBP's EAPA determination with instructions to identify where in the record is there any evidence of culpability that would justify a finding of "evasion."

**III.   CBP ARBITRARILY AND CAPRICIOUSLY SUSPENDED LIQUIDATION AND ASSIGNED AD/CVD CASH DEPOSITS IN AN OVERBROAD MANNER TO PLAINTIFFS' IMPORTS THAT CONTAIN NO TRIBAR, LACKING SUBSTANTIAL EVIDENCE THAT SUCH IMPORTS ARE "COVERED MERCHANDISE."**

The argument that Plaintiffs raise herein in Section III of this brief is that even if the Court were to conclude that all "tribar flooring" is within the scope of the AD/CVD Orders and therefore considered to be "covered merchandise," and even if CBP could reasonably interpret the EAPA statute to find that the Plaintiffs "evaded" the AD/CVD Orders based on their different interpretation of the product scope, this Court must nevertheless hold that CBP's determination is arbitrary, capricious, and unsupported by substantial evidence because it applied its interpretation of the scope so broadly so as to include significant quantities of imports that contain no tribar flooring whatsoever.

This did not have to happen.  As discussed in detail below, at several points during the proceeding, Plaintiffs provided clear information for CBP to distinguish the products that allegedly were covered by the Orders (specifically, "tribar flooring"), versus other products that are clearly outside the scope of the Orders because they contained no tribar inputs, such as pig farrowing crates that contained no flooring at all or contained only cast iron flooring.  In response, CBP ignored *all* of the detailed information that Ikadan and Gaosai provided.  CBP provided no rationale for ignoring the detailed information Ikadan and Gaosai carefully presented and explained.  Instead, CBP simply issued CF-29 notices that listed entries covered, without any detail as to what items were and were not covered or the amount of the rate advances.  After Plaintiffs complained that CBP's rate advances did not match what Plaintiffs expected based on their detailed presentation of the specific entries, line items, and values that *should have been* covered, CBP grudgingly presented brief spreadsheets that still did not provide all the necessary details to explain fully CBP's rate advance calculations.  CBP only provided

27

enough to make clear that CBP completely ignored Ikadan's and Gaosai's detailed analysis of the entries and rate advance amounts that *should have been* applied.

To assist the Court in understanding precisely how CBP's determination is unreasonably overbroad and unsupported by the administrative record, it is necessary to set forth a "roadmap" of the numerous factual submissions in the investigation that are relevant to Plaintiffs' contention.

### A.    Relevant Factual Background

As discussed in Section I above, Gaosai submitted a scope ruling request to Commerce (and also submitted it for the record in the EAPA investigation) that imports of pig farrowing crates and farrowing flooring systems do not fall within the scope of the AD/CVD Orders, even if the imports include tri-bar flooring input, because the AD/CVD Orders do not cover downstream products further manufactured from steel grating.

There is another scope ruling request that Ikadan filed with Commerce, which is also on the record in this proceeding.  On November 23, 2020, Ikadan submitted to TRLED a copy of a scope ruling request filed by Ikadan to Commerce, requesting that Commerce issue a scope ruling confirming that imports of ductile cast iron flooring for pig farrowing crates are outside the scope of the AD/CVD Orders.  Ikadan Scope Ruling Request to Commerce re Cast Iron Flooring, CR 113 (Nov. 23, 2020).  On December 3, 2020, Ikadan and Gaosai followed up with a letter to TRLED responding to a November 23, 2020 letter by Hog Slat.  Gaosai/Ikadan Letter to TRLED Responding to Hog Slat, CR 113a (Dec. 3, 2020).  Of particular relevance to Section III of this Argument is that Gaosai/Ikadan identified eight specific cast iron products, each of which contains no tribar whatsoever, because the imports are made of cast iron—not steel—and are cast as one piece, not made of two or more pieces.  *Id.* at 2.

ACTIVE.135866278.03

**PUBLIC VERSION**

On December 22, 2020, TRLED issued supplemental RFIs to Ikadan and Gaosai.  Ikadan Supplemental RFI, CR 114(b) (Dec. 22, 2020).  On January 13, 2021, Ikadan and Gaosai responded to the supplemental RFIs.  Gaosai Supplemental RFI Response, CR 116 (Jan. 13, 2021); Ikadan Supplemental RFI Response, CR 118 (Jan. 13, 2021).  Ikadan demonstrated that of all of Ikadan's imports during the relevant period, only two contained tribar galvanized steel flooring, and Ikadan identified those specific entries and provided relevant documentation in its response.  *Id*. at 3-4.  Gaosai demonstrated that of eight entries of farrowing crate sets for which TRLED requested additional information, only two contained flooring.  Gaosai Supplemental RFI Response, CR 116 (Jan. 13, 2021), at 3.

On December 31, 2020, Ikadan submitted a letter to TRLED stating that Ikadan had ceased all flooring imports pending the results of TRLED's investigation.  Ikadan Stop Examination Request, CR 115 (Dec. 31, 2020).  Ikadan also noted that CBP detailed and examined several containers that would have confirmed that no subject goods (*i.e.*, flooring) were included in these containers.  *Id*. at 2 & Attachment 2.  Ikadan stated that because it had stopped imports of the merchandise under investigation, CBP need not continue to waste resources in examining Ikadan's ongoing imports of merchandise *not* under investigation.  *Id*. at 2.

On July 1, 2021, (following TRLED's Determination), counsel for Ikadan and Gaosai sent an e-mail to Ms. Somboun Dauble of TRLED, raising again the issue that some entries of Ikadan's and Gaosai's "farrowing crate systems are designed to include tribar flooring, the tribar flooring components may not be included with every shipment of farrowing crates or farrowing crate parts."  E-mail from Randy Rucker to Somboun Dauble, CR 131 (July 1, 2021).  Counsel explained that "{t}his is because a particular shipment may not be a complete farrowing crate

ACTIVE.135866278.03

system (*i.e.*, a split shipment) or the tribar flooring may be sourced separately." *Id*. He added

that "{f}or example (as identified in our prior responses), of the Ikadan entries identified in

CBP's October 14, 2020 RFI, only entries [        ]7668 and [        ]1304 contained tribar

flooring." *Id*.

On July 7, 2021, CBP, through TRLED, issued a CF-29 form (Notice of Action) to

Ikadan, covering seven entries by Ikadan. Ikadan CF-29, CD 128 (July 7, 2021). The CF-29

described the merchandise as "steel grating/tribar flooring." *Id*. at 1 (box 9). The CF-29 stated

that the seven entries have been changed to "type 03" (*i.e.*, subject to AD/CVD duties) and that

AD/CVD duties have been added to all the entries. *Id*. at 1 (box 13). Along with the CF-29,

TRLED included a spreadsheet, listing a breakdown by entry number, with invoice descriptions.

CBP Spreadsheet for Ikadan, CD 130. The invoice descriptions on only two of the listed entries

mentioned the term "tribar," but the other entries described various parts for "farrowing crates."

*Id*. at 2. The spreadsheet also indicates that TRLED calculated AD/CVD duties "based on the

average tribar value per farrowing crate." *Id*. at 2.

On July 27, 2021, CBP, through TRLED, issued a CF-29 form to Gaosai, covering 14

entries by Gaosai. Gaosai CF-29, CD 132 (July 27, 2021). The CF-29 described the

merchandise as "farrowing crate." *Id*. at 1 (box 9). The CF-29 stated that CBP changed the

Harmonized Tariff Schedule of the United States ("HTSUS") classification of numerous entries

from 7308.90.9590 (a basket category for structures and parts of structures of iron or steel) to

7304.31.6050 (steel grating). *Id*. at 1 (box 13). The CF-29 also stated that CBP was rate

advancing all of the entries to apply AD and CVD duties. *Id*. at 1 (box 13).

On July 29, 2021, Ms. Somboun Dauble of TRLED sent an e-mail to counsel for Ikadan

and Gaosai, resending the CF-29s and also attaching a spreadsheet, listing a breakdown by entry

number, with invoice descriptions.  E-mail from EAPA ALLEGATIONS to Randy Rucker, CR

131 (July 29, 2021); CBP Spreadsheet for Gaosai, CR 129.  Some of the invoice descriptions

mentioned the term "tribar" but some of the invoice descriptions stated only "farrowing crate" or

"farrowing crates."  *Id*. at 2.  The spreadsheet for Gaosai does not indicate how TRLED

calculated the AD/CVD duties, but a comparison of the AD/CVD duties listed for each entry to

the entry summary information indicated that TRLED applied the percentage AD/CVD rate to

the entire entry.  *Id*. at 2.

    **B.**    **Standard of Review**

      As explained in Section I.B.1 above, EAPA directs the Court to review "whether any

determination, finding, or conclusion is arbitrary, capricious, an abuse of discretion, or otherwise

not in accordance with law."  19 U.S.C. § 1517(g)(2).  "With respect to the court's standard of

review, an abuse of discretion occurs when the decision is based on factual findings that are not

supported by substantial evidence."  *Royal Brush Mfg., Inc. v. United States*, 45 CIT ___, 545 F.

Supp. 3d 1357, 1372 (2021) (cleaned up), *appeal docketed*, No. 22-1226 (Fed. Cir. Dec. 21,

2021); *but see Consolidated Fibers, Inc. v. United States*, 32 CIT 24, 33-35, 535 F. Supp. 2d

1345, 1352-54 (2008) (holding that arbitrary/capricious standard and substantial evidence

standard require different levels of scrutiny).

      An agency decision is "arbitrary and capricious if the agency has relied on factors which

Congress has not intended it to consider, entirely failed to consider an important aspect of the

problem, offered an explanation for its decision that runs counter to the evidence before the

agency, or is so implausible that it could not be ascribed to a difference in view or the product of

agency expertise."  *Motor Vehicle Mfrs. Ass'n of United States Inc. v. State Farm Mutual*

*Automobile Insurance Co.*, 463 U.S. 29, 39 (1983).

31

When reviewing agency determinations, findings or conclusions for substantial evidence, the Court assesses whether the agency action is reasonable given the record as a whole. *Nippon Steel Corp v. United States*, 458 F.3d 1345, 1350–51 (Fed. Cir. 2006). Substantial evidence has been described as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *DuPont Teijin Films USA v. United States*, 407 F.3d 1211, 1215 (Fed. Cir. 2005) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229, (1938)). Substantial evidence has also been described as "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966). Fundamentally, though, "substantial evidence" is best understood as a word formula connoting a reasonableness review. 3 Charles H. Koch, Jr., *Administrative Law and Practice* § 9.24{1} (3d ed. 2022). Therefore, when addressing a substantial evidence issue raised by a party, the Court analyzes whether the challenged agency action "was reasonable given the circumstances presented by the whole record." 8A West's Fed. Forms, National Courts § 3.6 (5th ed. 2021).

Even if the Court here determines that, as a general matter, the "arbitrary and capricious" standard in the EAPA statute is not synonymous with "substantial evidence," application of the "arbitrary and capricious" standard, as articulated in *State Farm*, clearly warrants remand in this case. As shown below, CBP entirely failed to consider an important aspect of the problem because most of Plaintiffs' imports contained no tribar, and therefore most of Plaintiffs' imports cannot reasonably be considered to be "covered merchandise" and consequently should not be subject to continued suspension of liquidation or rate advancement. Furthermore, CBP not only offered an explanation for its decision that runs counter to the evidence before the agency—

which shows that not all pig farrowing crates contain tribar—but CBP offered no readily discernible explanation at all for its methodology in deciding what entries were subject to suspension of liquidation and were rate advanced.

As explained in Section I.B above, "'{t}he court's review of Customs' determination as to evasion may encompass interim decisions subsumed into the final determination.'" *Diamond Tools Tech. LLC v. United States*, 45 CIT ___, 545 F. Supp. 3d 1324, 1331 (2021) (quoting *Vietnam Firewood Co. Ltd. v. United States*, 466 F. Supp. 3d 1273, 1284 (2020)). Thus, CBP's determination also covers the CF-29 Notices of Action concerning Plaintiffs' entries, all relevant correspondence relating to the suspension of liquidation and rate advances noted in the CF-29s, and CBP's spreadsheets that purport to explain how it applied the rate advances.

### C. Most of Plaintiffs' Imports Contain No Tribar.

CBP's EAPA determination is arbitrary and capricious and unsupported by substantial evidence because CBP ignored detailed information that Ikadan and Gaosai provided to help CBP identify precisely those entries and line items that contained tribar, and identify the correct values of those items so that rate advances based on the AD/CVD cash deposit rates could be properly calculated.

#### 1. Pig Farrowing Crates Without Farrowing Floor Systems Are Indisputably Outside the Scope of the Orders, Because They Contain No Tribar or Steel Grating.

As an initial matter, it is indisputable that the pig farrowing crates *themselves* (*i.e.*, when imported without any farrowing floor systems) are outside the scope of the Orders. The pig farrowing crates themselves contain no tribar, or any other component that could even arguably be said to resemble a grate, and therefore cannot be steel grating subject to the Orders.

ACTIVE.135866278.03

2. **CBP's Determination Is Unsupported by Substantial Evidence Because It Ignored Undisputed Evidence Showing That Only Two Ikadan Entries Contain Tribar Flooring.**

CBP had several opportunities to narrow its findings regarding Ikadan to only those imports that contained tribar flooring as an input, but it repeatedly declined to do so.  For example, in Ikadan's first supplemental questionnaire response, Ikadan stated: "Please note it is *very rare* for Ikadan to import pig farrowing crates with galvanized tribar flooring.  In fact, it only occurred twice in the period under examination."  Ikadan Supplemental RFI Response, CR 118 (Jan. 13, 2021), at 3 (emphasis added).  In the same submission, Ikadan walked CBP through its supporting documentation explaining where and how to identify those entries containing tribar flooring:

> Out of the entries listed in the Appendix of CBP's October 14, 2020 Request for Information ("RFI"), two contained tribar galvanized flooring.  The supporting documentation provided at Exhibit I-17 of Ikadan's November 13 original Request for Information ("Ikadan's November 13, Response") response, demonstrates that in entry #2 (*i.e.*, entry summary number [          ], tribar was listed separately from farrowing crates ([
>
> ]."
>
> Exhibit I-17 also demonstrates that entry #5 (*i.e.*, entry summary number [          ] was a combination flooring item, "[
>                                       ]."  No other commercial documentation at Exhibit I-17 of Ikadan's November 13 Response references tribar.

Ikadan Supplemental RFI Response, CR 118 (Jan. 13, 2021), at 3-4.

Despite Ikadan's clear explanation that its importation of farrowing crates *with* tribar floors was *rare*, the TRLED Determination made a broad determination that record evidence shows that "tribar floors are part of the crate unit."  TRLED Determination, CR 123 (June 21, 2021), at 7.

In its Administrative Review Request, Ikadan boiled down the evidence to a detailed attachment showing a sample of Ikadan purchase orders to differentiate between those with and

34

**PUBLIC VERSION**

without tribar flooring.  *See generally* Ikadan Amended Administrative Review Request, CR 127 (Aug. 3, 2021), Attachment 1.  This attachment demonstrated in detail that only Entry [      ] and Entry [            ] contained tribar flooring.  Within Entry [           ], only products [          ] and [          ], both of which were separately listed on the invoice, contained tribar, and the other [ ] products listed contained no tribar.  *Id*., Attachment 1, at 1-2.  Within Entry [            ], product [         ] contained tribar, while the other product listed contained no tribar. *Id*., Attachment 1, at 3.  Entry [            ] contained no tribar.  *Id*., Attachment 1, at 3-4.  Entry [           ] contained no tribar.  *Id*., Attachment 1, at 4-5.  Entry [           ] contained no tribar.  *Id*., Attachment 1, at 5.  Entry [           ] contained no tribar.  *Id*., Attachment 1, at 5-6. Finally, Entry [           ] contained no tribar.  *Id*., Attachment 1, at 6-7.  In short, Ikadan demonstrated that [ ] of the [ ] entries examined by CBP contained no tribar flooring.  *Id*., Attachment 1, at 7.

Nevertheless, CBP ignored all of the detailed evidence that Ikadan presented on the record showing that nearly all of the Ikadan entries contained no tribar.  CBP continued suspension of liquidation and rate advanced all [ ] of the Ikadan entries that it examined, without explanation.  Ikadan CF-29, CR 128 (July 7, 2021); Copy of Ikadan CF-29 per-line breakdown, CR 130 (July 29, 2021).  Moreover, CBP appeared to have calculated the value subject to AD/CVD for the [ ] entries that contained no tribar based on an "[

]" that it calculated to be $[      ]." *Id*.

      **3.**    **CBP's Determination Is Unsupported by Substantial Evidence Because It Ignored Undisputed Evidence Showing That Many of Gaosai's Entries Contained No Tribar Flooring.**

Similarly, Gaosai provided thousands of pages of documentation throughout the course of the investigation—including purchase orders, pictures of the merchandise at issue, material invoices, and mill certificates—demonstrating which entries *did* contain tribar flooring and

which entries *did not*. *See*, *e.g.*, Gaosai RFI Response, CR 31 through CR 41 (Nov. 13, 2020), Exhibit WG-15.

TRLED did not determine that this information was false or insufficient. TRLED did not separate out tribar flooring from other items that contained no tribar flooring. Instead, TRLED simply disregarded the fulsome record evidence.

Nevertheless, without citing any specific record evidence and despite the voluminous evidence outlined to the contrary, CBP reached a misleading, broad-brush conclusion that Gaosai's responses show that it "regularly import{s} tribar floors, listing them under the description 'parts for farrowing crates' rather than separately listing the tribar floors.'" TRLED Determination, CR 123 (June 21, 2021), at 8.

In its Administrative Review Request, Gaosai provided a detailed attachment showing how CBP could interpret the information in entry documentation to distinguish between the use of "farrowing crate" and "tribar" invoices/entries. *See generally* Gaosai Amended Administrative Review Request, CR 126 (Aug. 3, 2021), Attachment 1. Gaosai demonstrated that Entry [          ] did not contain tribar flooring. *Id*., Attachment 1, at 2. Entry [
  ] did not contain tribar flooring. *Id*., Attachment 1, at 3. Entry [          ] did not contain tribar flooring. *Id*., Attachment 1, at 4. Gaosai also demonstrated, with detailed record information provided in Exhibit WG-15 of Gaosai's original RFI Response (CR 31 through CR 41 (Nov. 13, 2020)), that those line items that described "farrowing crates" did *not* contain tribar flooring. Gaosai Amended Administrative Review Request, CR 126 (Aug. 3, 2021), Attachment 1, at 5-12. A copy of the summary of relevant entry summary numbers, part numbers, entry dates, and invoice descriptions for Exhibit WG-15 is found at Gaosai Amended Administrative Review Request, CR 126 (Aug. 3, 2021), Attachment 1, at 12.

36

PUBLIC VERSION

Nevertheless, CBP ignored all of this evidence, without explanation of why it was wrong or somehow irrelevant.  CBP continued suspension of liquidation and rate advanced Entry [

] which, as noted above did not contain tribar flooring.  Gaosai CF-29, CR 132 (July 27, 2021).  CBP also continued suspension of liquidation and rate advanced the following entries from Exhibit WG-15, even though all of these entries contained *only* farrowing crates, and contained *no* tribar: Entry [            ], Entry [            ], Entry [            ], Entry [

], and Entry [            ].  *Compare*, Gaosai Amended Administrative Review Request, CR 126 (Aug. 3, 2021), Attachment 1, at 12, with Gaosai CF-29, CR 132 (July 27, 2021).  As explained in Section III.A above, TRLED also provided a spreadsheet listing a breakdown by entry number, with invoice descriptions.  CBP Spreadsheet for Gaosai, CR 129.  The spreadsheet does not explain how TRLED calculated the rate advance for AD/CVD duties, but a comparison of the AD/CVD duties listed for each entry to the entry summary information indicates that TRLED applied the percentage AD/CVD rate to the entire entry.  *Id*.

All in all, it is impossible to characterize CBP's actions as anything less than arbitrary and capricious.  There was an immense amount of record evidence for CBP to distinguish between imports containing tribar and imports containing no tribar, and to use that evidence to suspend liquidation and rate advance entries of "covered merchandise" based on substantial evidence.  CBP simply ignored it all.  This Court therefore should hold that CBP's determination is arbitrary, capricious, and unsupported by substantial evidence.

### D. CBP Assessed Duties Based on a Conclusory, *Sub Silentio*, and Unsupportable Determination That All Farrowing Crates Necessarily Contain Tribar Flooring.

As shown above, CBP has suspended liquidation and rate advanced many entries that contained no tribar flooring, and for many of the entries that did contain *some* tribar but also contained non-tribar products, CBP has apparently rate advanced the entries as a whole, rather

37

than limiting the rate advance to particular products within the entries that contain tribar.  As a result, CBP has effectively made a *sub silentio* determination that tribar floors are a *necessary* part of the crate system.  In other words, CBP's apparent position is that farrowing crates necessarily contain tribar flooring, and are thus, subject to the AD/CVD Orders perforce.  This means that CBP has effectively expanded the finding of evasion to "farrowing crate" substructures, as opposed to just tribar flooring (notwithstanding Ikadan's and Gaosai's position that tribar flooring itself is not subject to the Orders) based on a conclusory assumption.  *See* TRLED Determination, CR 123 (June 21, 2021), at 7 ("The [                    ] must be imported to complete the project as designed, since the project designed requires [                    ].").  CBP does not cite to any record evidence supporting this statement as a general matter applicable to all farrowing crates.  CBP's apparent position is simply wrong and is certainly not based on substantial evidence as required by law.

In fact, the record evidence demonstrates otherwise.  According to Ikadan's brochure, the farrowing crates at issue constitute an "incredibly flexible" system, "thanks to its modular design."  Ikadan RFI Response, CR 108 (Nov. 13, 2020), Exhibit I-5.  Further, in its request that CBP stop examination of the Company's imports, Ikadan provided a sample entry of a pig farrowing crate without any flooring (tribar or cast-iron).  Ikadan Stop Examination Request, CR 115 (Dec. 31, 2020), Attachment 1.  Ikadan additionally provided a photograph associated with the entry describing it as follows:

[


].

ACTIVE.135866278.03

*Id*.  Thus, the record clearly demonstrates that a farrowing crate need not include tribar flooring, and further, even if the end product can include tribar flooring by nature of the modular system, Ikadan may source the flooring elsewhere.

Ikadan also presented additional evidence showing that a "farrowing crate" may or may not include flooring.  *See*, *e.g.*, Ikadan Administrative Review Request, CR 127 (Aug. 3, 2021), at 14 (discussing differences in references to "farrowing crate" depending on the context and noting that all farrowing crates are custom fabricated).  These arguments apply with equal force to imports from Gaosai.  *See* Gaosai Amended Administrative Review Request, CR 126 (Aug. 3, 2021), at 12 (discussing fact that reference to a "farrowing crate" may refer to either the entire "farrowing crate system" or a specific reference only to the crate substructure itself that sits atop the flooring).

### E. In Its Administrative Review, CBP Avoided Determining Which Entries/Line Items of Merchandise Imported by Ikadan and Gaosai Actually Contained Tribar Flooring Input.

Ikadan and Gaosai both requested an Administrative Review to give CBP an opportunity to correct this fatal error.  As detailed in Section III.C.2 above, in its Administrative Review Request, Ikadan provided highly detailed and documented evidence to confirm that only two entries subject to the investigation contained tribar flooring, and that each of the other entries examined by TRLED contain *no* tribar flooring.  Ikadan Amended Administrative Review Request, CR 127 (Aug. 3, 2021), Attachment 1.  Similarly, as detailed in Section III.C.3 above, in its Administrative Review Request, Gaosai provided highly detailed and documented evidence to demonstrate that certain entries did not contain tribar flooring at all, and that several other line items of other entries containing the description "farrowing crate" did not contain tribar flooring.  Gaosai Amended Administrative Review Request, CR 126 (Aug. 3, 2021), Attachment 1.

In its Administrative Review Determination, CBP's only response to Ikadan's and

Gaosai's detailed arguments demonstrating that TRLED's findings were grossly overbroad was

by avoiding the issue entirely:

> The Importers' argument that CBP has applied an overly broad interpretation
> of which entries include tribar floors does not have any bearing on whether
> there is substantial evidence of evasion.  The administrative record contains
> substantial evidence that entries of covered merchandise were made by the
> Importers during the period of investigation and were not declared as subject to
> the AD/CV duty orders.  This constitutes evasion as defined by EAPA and the
> finding of substantial evidence of evasion stands, notwithstanding the
> Importers' argument concerning the number of entries subject to AD/CV
> duties included during the period of investigation.

Administrative Review Determination, PD 80 (Oct. 26, 2021), at 10.

### F.     CBP's Failure to Correct Its Overbroad Determination Results in a Determination That Is Arbitrary, Capricious, and Unsupported by Substantial Evidence.

CBP's dodge of the issue requires this Court to hold that this EAPA determination is

unsupported by substantial evidence and thus is arbitrary and capricious.  First, the text and

structure of EAPA requires CBP to determine what is "covered merchandise."  Section

517(c)(1)(A) of the Tariff Act requires CBP to determine whether "covered merchandise" was

entered into the customs territory of the United States through "evasion."  19 U.S.C. §

1517(c)(1)(A).  Section 517(a)(3) states that "covered merchandise" means "merchandise that is

subject to" an AD or CVD order.  19 U.S.C. § 1517(c)(1)(A).  Thus, CBP is required to not only

make a determination of "evasion," but the agency must also identify the "covered merchandise"

that is subject to an AD or CVD order and was entered into the United States through the

"evasion."

Second, Section 517(d)(1) of EAPA (concerning "Effect of Determinations") requires

CBP, among other things, to "suspend the liquidation of unliquidated entries of such covered

merchandise that are subject to the determination," or if CBP has already suspended the

40

liquidation of "such entries" pursuant to CBP's authority to take interim measures, "continue to suspend the liquidation of such entries." 19 U.S.C. §1517(d)(1)(A). This necessarily requires CBP to determine the universe of unliquidated merchandise already imported that constitutes "covered merchandise" and apply the suspension of liquidation to those entries and nothing that falls outside the universe of "covered merchandise." In short, the statutory scheme simply does not allow CBP to declare that one or two entries are definitely "covered merchandise" but then apply the remedy to suspend liquidation of other entries for which CBP has produced no substantial evidence of constituting "covered merchandise." Here, by avoiding any analysis in its Administrative Review of determining *which* Ikadan and Gaosai entries/line items do or do not include tribar flooring, and instead falling back on an assertion that some unidentified quantum of entries contain at least one line item of tribar flooring, CBP has no basis for suspending liquidation or continuing suspension of liquidation to cover any entry that it suspects might theoretically include tribar flooring, such as *all entries that include pig farrowing crates or parts thereof*.

Accordingly, the Court should hold that CBP's determination is unsupported by substantial evidence insofar as it fails to determine which entries do or do not contain "covered merchandise."

## IV.   CONCLUSION AND PRAYER FOR RELIEF.

For all of the above reasons, Plaintiffs respectfully request that the Court:

1)   Enter judgment in favor of Plaintiffs;

2)   Hold and declare that CBP's interpretation of the scope of the Orders to include not only all steel grating, but also all downstream products that include steel grating as an input, is not in accordance with law and/or is arbitrary and capricious;

**PUBLIC VERSION**

3)      Hold and declare that CBP's determination that Ikadan and Gaosai "evaded" the Orders, simply because CBP interpreted the scope of the Orders differently than did Ikadan and Gaosai, is not in accordance with law;

4)      Hold and declare that CBP's determination to suspend liquidation of all of unliquidated entries imported by Plaintiffs that include farrowing crates (past and future), and to impose AD/CVD cash deposit requirements on all such entries, is arbitrary and capricious;

5)      Remand CBP's determination with instructions to reconsider its ultimate finding of evasion and all subsidiary findings in a manner that is in accordance with law and is no longer arbitrary and capricious; and

5)      Grant Plaintiffs such additional relief as the Court may deem just and proper.

Respectfully submitted,

/s/ Richard P. Ferrin
Douglas J. Heffner
Wm. Randolph Rucker
Richard P. Ferrin
**FAEGRE DRINKER BIDDLE & REATH LLP**
1500 K Street, N.W.
Washington, DC 20005
(202) 230-5803

*Counsel to Plaintiffs Ikadan System USA, Inc. and
Weihei Gaosai Metal Product Co., Ltd.*

April 22, 2022

ACTIVE.135866278.03

PUBLIC VERSION

**Certification of Compliance with Chambers Procedure 2(B)(1)**

The undersigned hereby certifies that the foregoing brief contains <u>13,152</u> words, exclusive of the table of contents, table of authorities, and counsel's signature block, and therefore complies with the maximum word count limitation of 14,000 for primary briefs set forth in the Chamber Procedures of the U.S. Court of International Trade.

<u>/s/ Richard P. Ferrin</u>
Douglas J. Heffner
Wm. Randolph Rucker
Richard P. Ferrin
**FAEGRE DRINKER BIDDLE & REATH LLP**
1500 K Street, N.W.
Washington, DC 20005
(202) 230-5803

*Counsel to Plaintiffs Ikadan System USA, Inc. and Weihei Gaosai Metal Product Co., Ltd.*